## Blue Grass Coal Corporation v. D. Y. & Mary Combs.

(Decided February 11, 1916.)

### On Motion to Dissolve Injunctions.

1.   Mines and Minerals—Purchaser of Lease—Notice.—Under the evidence the purchaser of a coal mining lease is held to have had notice of an amendatory lease previously made, which had not been placed upon the record, and that the physical facts are such as to have put the purchaser upon inquiry.

2. Mines and Minerals—Purchaser of Lease—Notice.—Where one coal mining company buys a lease which is being operated by another company, and the general manager of the selling company has actual knowledge of the provisions of an amendatory lease which has not been recorded, and continues to be the manager of the operation for the buying company, his knowledge will be imputed to the latter company.

3. Mines and Minerals—Purchaser of Lease—Notice.—Where the amendatory lease of which the purchaser has notice is so intimately connected and interwoven with another contract entered into by the selling company that they are in effect one contract, and the amendatory lease refers on its face to the other contract, and the purchaser, after taking possession of the property, acts under the contract so referred to in the amendatory lease, he will be held to have assumed the obligations of that contract.

4. Mines and Minerals—Leases and Contracts.—Under a lease of 370 acres of land for coal mining purposes wherein the lessees are given the exclusive right to mine coal therefrom and there is enumerated therein all the usual privileges given to mining companies, including the use of the surface thereof for chutes, inclines, side tracks, railroad switches, tramways, miners' houses, etc., and after the granting of all these privileges the lessees expressly reserve to themselves the right to the use of the surface of the said tract of land for any purpose which is not inconsistent with or harmful to the mining operation, the lessees, to the extent of their reasonable necessities for mining purposes, have the paramount right to the use of the surface, but not the arbitrary right to exclude the lessors.

5. Mines and Minerals—Leases and Contracts.—The lessees' right to the use of the surface under the terms of such a lease is confined to whatever is reasonably necessary in the efficient operation of the mines, and as long as there is building space reasonably suitable for the purpose outside of the inclosed lands and fields being farmed by the lessors, the lessees will not be permitted to build on such inclosed lands so as to exclude the lessors therefrom.

6. Mines and Minerals—Leases and Contracts.—The fact that houses may be built cheaper on the inclosed land, or that houses located thereon may be more convenient, does not authorize the exclusion of the lessors therefrom; the rights of the lessees must be measured by their reasonable necessities in the mining operation, rather than their mere convenience.

7. Nuisance—Pollution of Supply of Mine Water.—The operation of a saw mill by the lessors on the tract of land where the mining operation is being carried on, at a point thereon which results in the pollution of waters of a stream from which the mining operation derives its supply of water, is an interference with the mining operation, and the chancellor will require the mill to be removed.

8. Mines and Minerals—Leases and Contracts.—Where the mining lease gives to the lessees the right to the use of certain timber to be used on the leased premises and no other, the lessees will

be enjoined from using timber taken from that tract of land in its mining operations on other lands.

9.  Mines and Minerals—Leases and Contracts.—Where the lessees are given the right to use the premises described and all shafts, tipples, etc., that may be thereon, for the purpose of mining and removing coal from other lands adjacent thereto which they may thereafter acquire, the lessees may build miners' houses on the leased premises for occupation by miners engaged in its mining operations on other lands.

WOOTTON & MORGAN for plaintiff.

HAZELRIGG & HAZELRIGG, MILLER & WHEELER, and HOGG & JOHNSON for defendant.

OPINION OF THE COURT BY JUDGE TURNER.—Modifying the injunction against the defendants, and overruling the motion to dissolve the injunction against the plaintiff.

These are motions before me to dissolve two injunctions granted by the Perry Circuit Court growing out of the same controversy—one enjoining D. Y. and Mary Combs from exercising certain privileges which they claim upon the surface of certain tracts of coal lands in Perry County, and the other enjoining the Blue Grass Coal Corporation from cutting and removing certain timber from the said lands for use in its mining operations on adjoining lands.

In January, 1913, D. Y. Combs and his wife, being the owners of certain tracts of coal lands, entered into a contract of lease with W. M. Jones, W. R. Marsee and C. R. Luttrell whereby they leased to the latter the coal mining privileges thereon.

The lease provides:

"That for and in consideration of the covenants and agreement hereinafter contained, the said lessors have leased, demised and let and do hereby lease, demise and let unto the said lessees, for the full term of fifty years from and after this date for the purpose of mining coal and holding possession thereof for said lessees, certain tracts and parcels of land.  *  *  *  The lessees shall have the exclusive right and privilege during the continuation of this lease, of digging and mining coal within, upon, and under the boundaries described; of carrying away, selling and disposing of the same and of constructing, building and using underneath said lands and upon the surface thereof, such chutes, inclines, side tracks, railroad switches, railroads, tramways, miners' houses,

store houses and any buildings, or installing any kind of machinery or any kind or character of construction deemed necessary by the parties of the second part for carrying on said coal mining operations on said leased premises and the delivering and shipping of said coal therefrom with the right to enter and remain upon said tract for the aforesaid purpose at once and remain during the continuance of this lease. The lessees are granted and given the right to use for mining purposes or building purposes in any manner by them, all the timber that will girth less than sixty inches, three feet above the ground; and all the timber that girths sixty inches and more shall be the property of the lessors, to be used by them for their own building and construction work as they see fit, but for no other purpose, provided same shall have been used within a period of five years next hereafter, and provided further, that in the event the lessees mine and produce coal enough from the leased premises herein that the royalties herein provided for will amount to four hundred dollars per month and for which the lessees will become liable to the party of the first part for that amount of royalty, then in this event and whatsoever it may happen, the timber that girths sixty inches and over shall belong to the parties of the second part, and the parties of the first part then and there release all right, title and interest to same; and same shall be used by parties of the second part for mining purposes as needed by second parties.

"Lessors further covenant and agree that the lessees shall and may at all times during this lease, quietly and peaceably enjoy the leased premises for the purpose aforesaid without any let or hindrance and free from any person or persons lawfully claiming the same or any part thereof; provided further that the lessors retain unto themselves the right to enter upon said leased premises at any time for the purpose of inspecting or examining the leased premises or operations, and the right to use of said land for any purpose which is not inconsistent or harmful to the rights and privileges and usages of the land hereby demised and let    *    *    *    The lessors further covenant and agree with the lessees that as a part of this lease and any renewal thereof, the lessees are hereby given the right and privilege of using the said premises herein described and any opening, shafts, tipples, inclines, switches or any other appliance as may

be thereon for the purpose of mining and removing any other coal they may desire to remove on said lands adjacent to this land, that lessees may hereafter acquire, and after lessees get to adjacent coal and begin to take out same then the lessors agree that they will accept proportionate royalties mined by said lessees from adjacent properties according to acres owned by each party, but for this privilege the second parties covenant and agree to pay to the parties of the first part the sum of two cents per ton for each and every ton thus acquired and brought through and over the leased premises herein except the lands of John Eversole and Eversole and Cornett, and Wm. Wells, which is to come through free and which is to be paid for in the same manner and at the times the coal herein mentioned is designated to be paid for and the railroad weights will govern as to the amounts.''

This lease was duly recorded in the Perry County Court, and in March, 1913, was assigned by the lessees to the Hazard-Dean Coal Company. That company proceeded shortly thereafter to open up mining operations on the lands, and in June, 1913, W. M. Jones, one of the officers of the company, entered into a contract with D. Y. Combs, for the use and benefit of the company, whereby the latter was to furnish certain lumber and timber, to be used in the mining operations, at certain specified prices. Combs, in order to comply with this contract, bought and set up on the lands a saw mill and furnished a great deal of lumber to the Hazard-Dean Coal Company under the terms of the contract.

In March, 1914, D. Y. Combs and his wife and the Hazard-Dean Coal Company entered into an amendatory contract of lease whereby they abrogated certain provisions in the original lease.

That amendatory lease, in so far as it is material here, provides:

''THAT WHEREAS, the parties of the first part did lease to the party of the second part a certain boundary of land which they owned on Messers Branch in Perry County, Kentucky, for the purpose of second. party mining and carrying on mining operations thereon, and in said lease there are certain timber rights granted to the said second party, and also certain rights to timber for first party's use for their own building purposes to certain timber from certain dimensions and up, and there

is a clause in said lease that provides that in the event
second party mine and ship sufficient coal in any one
month for the royalty thereon to amount to as much as
four hundred dollars to first party, then in that event all
their rights to any of said timber would cease; but for
certain considerations and agreements this day entered
into by the parties hereto, the said Hazard-Dean Coal
Company agrees with first party that that certain clause
herein referred to will not be enforced; but that in the
event first party cuts no more timber from said land
herein leased at the present time and agreeing that all
said timber may remain on said land, except that he
already has cut which is to be used by first party for his
own building purposes, that is, in constructing buildings
for his own personal use and on his own premises, and
not for any other; and by first party's agreeing that sec-
ond party may have free access to all of said remaining
standing timber on said land for the use and benefit of
said lease to be used on said leased premises, and no
other, and the said second party also to have at the same
price they have heretofore been paying said first party
for lumber of the grades and dimensions set out in a
certain contract, which now exists between first party
and one W. M. Jones, of Barbourville, Ky., but said con-
tract having heretofore been assigned to the Hazard-
Dean Coal Company by the said Jones.

"Now we, the Hazard-Dean Coal Company, agree that
the said D. Y. Combs to cut and remove for his own pur-
poses as above stated, and for no other, timber from
said lease tract in after years. And during the period of
said lease as he may need same for his own use in build-
ing for himself as heretofore stated.

"In case said company desire any more or all of said
timber cut and manufactured into lumber for their use
on said lease the said first party binds themselves to cut,
saw in the woods and deliver to mill and saw or cause
to be sawed at their own expense such lumber as second
party may need for the sum of fifteen dollars per thou-
sand, said lumber to be good sound lumber, cut to the
specifications and dimensions furnished by second party
to first party at such times as they may desire same."

This amendatory contract, however, never was placed
on the record, the copy thereof retained by Combs having
been destroyed by fire shortly thereafter.

In April, 1915, the Hazard-Dean Coal Company conveyed and transferred all of its rights under the original lease to the Blue Grass Coal Corporation, there being no reference in the conveyance to the amendatory contract.

The Blue Grass Coal Corporation instituted this action, and alleges in its petition that the royalties from the coal lands have already, in several months, amounted to more than four hundred dollars per month, and that by reason thereof, under the terms of the original contract, it became the absolute owner of all the timber on said tract of land; that the defendants are wrongfully and without right cutting and removing the same, and are without right through and by their tenants and employes building houses on the lands and occupying houses thereon; that by reason of such acts on the part of the defendants that it has been hindered and delayed in its mining operations and has been prevented from building houses, tipples, &c., thereon; and that the sawdust from defendant's said saw mill, by filling up the branches and creeks on said lands, has polluted the waters therein; that the defendants are daily trespassing on said lands and that the said acts are continuing from day to day and are of such constant and recurring nature that in an action at law there is no adequate remedy without a multiplicity of suits.

The defendants in their answer, after denying in the first paragraph many of the material allegations of the petition, in the second paragraph set up the contract of June, 1913, and alleged that the mill, which he had erected on the tract of land to carry out the same, was located on the lands on the 29th of April, 1915, when the plaintiff purchased from the Hazard-Dean Coal Company the said lease, and that the defendants were at that time operating the said mill in performance of the said contract, and that the plaintiff had full and complete knowledge of the said contract and the operation thereunder by the defendants, and that thereafter with such knowledge, the plaintiff did order and direct the defendants to cut, saw and furnish to it certain lumber under the terms of said contract. They also plead and rely upon the amendatory contract of lease of March 7th, 1914, and allege that the plaintiff had full and complete knowledge of said amendatory contract and of its execution and existence and contents before it became the purchaser of the lease and at the time thereof.

They allege in their third paragraph that the plaintiff is cutting and removing, and threatening to continue to cut and remove from said lands so leased certain timbers to be used by it in its mining operations on other and different lands, and prayed that the plaintiff be enjoined from interfering with the use of the surface of said lands by the defendants except in so far as it is actually and reasonably necessary to the plaintiff in its mining operations on said lands; that it be enjoined from building upon the surface of the said lands houses to be occupied by persons engaged in mining coal from other lands, and from cutting and removing timber from lands of plaintiff to be used in mining operations on other lands.

Upon the filing of this action the clerk granted a temporary restraining order, called a temporary injunction, wherein the defendants and their employes are enjoined from cutting, sawing or removing any timber, trees or lumber from the tracts of land named, and from setting up and operating any saw mill thereon, and from building houses and occupying houses thereon, and from entering upon said lands or molesting in any way the plaintiff in the exercise of its rights in mining and transporting coal therefrom, and building houses, tramways, and other necessary work to the carrying on of its mining operations.

The lower court, after a full hearing, adjudged:

"That the temporary restraining order herein, which issued on the 13th day of November, 1915, be and the same is hereby made perpetual and the defendants, D. Y. Combs and Mary Combs, all persons working by, through or under them or for them, or under their authority, are here and now enjoined and restrained from cutting down, sawing up or removing any timber trees from the said land set out and described in this petition and the temporary injunction herein, or from cutting up or sawing up, or in any way interfering with said timber or trees, or timber that is now cut down on said land in the tree and which has been sawed into logs or other cuts. Defendants D. Y. Combs and Mary Combs are also enjoined and restrained from removing any of the lumber that has been cut or sawed at the mill since September, 1915.

"They are further enjoined and restrained from operating in any way the saw mill now on the premises or from setting up any other saw mill.

"Defendants and each of them are also enjoined and restrained from in any way molesting, interfering with and hindering the plaintiffs, or any of its agents or employes from building houses on said land set out and described in the petition in this case, and also set out and described in the temporary injunction granted herein, or from in any way interfering with the plaintiffs or any of its tenants in occupying said houses and from molesting in any way the plaintiff in the exercise of its rights of mining and the transporting coal from said premises hereinbefore referred to, or from building its houses, tramways, tipples, chutes, inclines, or from molesting or hindering in any way other work necessary or deemed by it necessary in the carrying on of its mining operations."

On the counter-claim of the defendants the court granted the following order of injunction, to-wit:

"It is therefore ordered and adjudged by the court that the defendants, D. Y. Combs and Mary Combs, are now granted an injunction against the plaintiff, Blue Grass Coal Corporation, its agents, officers, and employes, and it, its said officers, agents and employes, are now enjoined and restrained from cutting and removing any timber off the lands of the defendants described in the lease, of date the 11th day of January, 1913, from D. Y. Combs and Mary Combs to W. M. Jones, W. R. Marsee and C. R. Luttrell, for the purpose of using in any way in its mining operations in any way on the lands of J. B. Eversole, Clara E. Cornett and Manon Cornett and W. M. Wells, and from using the same upon the lands of said parties, and from using said timber in any way other than the lands of D. Y. Combs and Mary Combs."

Four questions are presented for adjudication:

First—Is the present lessee bound by the provisions of the amendatory contract of March, 1914, and, if so, what is the effect of that amendment?

Second—Is it bound by the terms of the timber contract of June, 1913, referred to in the amendatory contract of March, 1914, and under which Combs was operating on the premises when it took its assignment of the lease from the Hazard-Dean Coal Company in April, 1915?

Third—What are the rights of the parties with reference to the use of the surface of the lands?

Fourth—Has the lessee the right to take timber from the Combs' lands to be used in mining operations on other lands, and has it the right to build houses on the Combs' lands to be occupied by its employes who are engaged in mining operations on other lands?

At the time the amendatory contract of March, 1914, was entered into the Hazard-Dean Coal Company was operating on the lands, and Marsee, one of the original lessees, was the president of that company. Under the terms of the original contract Combs had the right to remove within five years, for his own building and construction work, all the timber from the lands that girthed sixty inches or more three feet from the ground, provided only that if within that time the royalties on the coal mined therefrom did not amount to $400.00 or more in any one month. At that time the royalties had not amounted to that much, and it was within the five year period, so that he was within his rights in removing all such timber from the lands as he might need for his own building and construction work. Under these conditions Combs was proceeding to remove the large timber, and Marsee, realizing that this timber in after years would be needed in the mining operations on the property, and thinking that when needed it could probably be procured, by reason of its situation, more conveniently and cheaper, although it might belong to Combs, than it might be elsewhere procured, proposed to Combs to abrogate the $400.00 clause in the original lease if he would then cease to cut the large timber and let it remain upon the property so that it would thereafter, when needed, be available for mining purposes.

Under these conditions they entered into the contract of March 7, 1914, by which the four hundred dollar clause in the original lease was abrogated, Combs agreeing to cease cutting timber at that time from the property, the company agreeing that he might do so, however, during the period of said lease as he may need same for his own use in building.

It is the contention of the plaintiff herein that it is not bound by the terms of this amendatory contract of lease, and that as the royalties have amounted to more than four hundred dollars to the defendants in several months that it is under the terms of the original lease the absolute owner of all the timber on the lands.

The evidence of the president of the Blue Grass Coal Corporation, who is the same man who organized it, and of the general manager thereof, is that they had no knowledge or notice of the amendatory contract until after the assignment by the Hazard-Dean Coal Company to the plaintiff company.

On the other hand the evidence shows that this amendatory contract was among the papers of the Hazard-Dean Coal Company, which was turned over to the Blue Grass Coal Corporation; that it was filed in this action by the plaintiff; that Marsee, one of the original lessees and the president of the Hazard-Dean Coal Company, who executed this amendatory contract upon behalf of that company, is now a large stockholder in the plaintiff company, and had in the negotiations between the Hazard-Dean Coal Company and the plaintiff company before the assignment an understanding with Jennings, who was promoting the Blue Grass Coal Corporation, that Marsee should have as much stock in the new corporation as he desired up to a certain point; that Luttrell, who was one of the original lessees and the general manager of the Hazard-Dean Coal Company, had actual knowledge of this amendatory contract, and continued to be manager of the Blue Grass Coal Corporation for some time after it took possession of the leased premises. In addition to this Combs testifies that he told Jennings before he bought out the Hazard-Dean Coal Company that the timber contract under the original lease had been changed, and the uncontradicted evidence of Combs and another witness is to the effect that shortly after the Blue Grass Coal Corporation took possession of the property Jennings recognized that all the timber girthing over sixty inches three feet from the ground was the property of Combs.

Again it is undenied that when Jennings went to examine the property before the transfer, and at the time of the transfer, Combs had his saw mill located on the lands and in operation, and that a large quantity of lumber was piled up thereon, and Marsee testifies that he told Jennings that the mill and lumber were the property of Combs.

The weight of the evidence, when it is all considered, seems to show not only that Jennings had notice of the amendatory contract, but that the facts were such as to put him upon inquiry.

Not only so, but Luttrell was the general manager of the Hazard-Dean Coal Company and had actual knowledge of the amendatory contract and its provisions and continued to be the manager of the Blue Grass Coal Corporation for some time after it took charge of the property, and under these circumstances his knowledge must be imputed to the latter company.

The lease as amended therefore means that the large timber is the property of the defendants, with the restriction, however, that it is "to be used by them for their own building and construction work as they see fit, but for no other purpose." This restriction, as above indicated, was doubtless placed in the lease by the lessees so that the mining operation might have convenient timber within its reach that it could purchase when needed, and with that end in view restricted the right of general sale.

The timber contract of June, 1913, and the amendatory lease of March, 1914, are so intimately connected and interwoven with each other by reason of the reference in the latter to the provisions of the former that they are, in effect, one contract, and the plaintiff company having knowledge of the latter contract and its provisions must be deemed to have known of the former contract and its provisions; and especially is this true in the light of the uncontradicted evidence that it, after assuming control of the mining operations, ordered timber from Combs and paid him therefor under the terms of that contract, and in this situation it must be held to have assumed the obligations of the Hazard-Dean Coal Company under that contract.

Clearly it was in the minds of the parties to this lease that the mining thereon should be deemed or considered the chief or major operation, and that any other business conducted thereon should be subservient to it. The lessee is given the exclusive mining privilege and the privilege of building chutes, tipples and inclines, railways and tramways, to install any kind of machinery, and the right to use in its mining operations all timber of less than sixty inches in girth, and it is given the right to quietly and peaceably enjoy the leased premises without hindrance for these purposes.

But the tract of land consists of about 370 acres, and, notwithstanding the broad powers granted the lessee, it is apparent that the parties contemplated at the time the

lease was drawn and executed that the lessees would not require in their mining operations the use of the whole surface, for in that lease the lessors, after enumerating at length the various privileges granted to the lessees, expressly reserved to themselves ''the right to use of said land for any purpose which is not inconsistent or harmful to the rights and privileges and usages of the land hereby demised and let.''

The evidence is that the land is very rough, there being very little level ground on it; that there are now about forty-four or forty-five houses on it occupied by the tenants of the company, besides some six or seven houses which were on the property when it was originally leased and which are occupied by the tenants of the defendants engaged either in the timber operations thereon or the farming operations. It appears that there is about one hundred acres of enclosed land on the premises, most of which is being, and has been for several years past, cultivated by the defendants in one way or another.

The company is building, and is desirous of continuing to build, a number of new houses for its miners with a view of extending the operations and increasing its output, and the chief controversy on this branch of the case grows out of its contention that it has a right, under the terms of the lease, to build its houses anywhere it may see proper on the premises, even though it interfere thereby with the saw mill and lumber yard and the enclosed farming lands.

On the other hand the defendants say that it is not necessary for an efficient conduct of the mining operations that the plaintiff should build its houses either on the farming land or upon the site of the saw mill or lumber yard; that there are plenty of available and suitable locations for houses without doing so.

The evidence shows that the plaintiff now has on its payroll about one hundred and forty men, and that the output is approximately eight thousand tons per month from the whole operation, including the adjoining lands. The company intends to extend its operation and at least double its output, and with that end in view it is already building miners' houses on the property.

As already indicated, the company's right to the use of the surface, in so far as it is reasonably necessary to efficiently carry on its mining operations, is paramount

to that of the defendants; but this does not mean that
the company has the arbitrary right, when the necessity
therefor does not appear, of occupying the farming lands
or the enclosed fields. The rights of the parties to the
use of the surface are reciprocal under the terms of
the lease; that is to say, the company, so far as its neces-
sities in the mining operations go, is first entitled to the
use of the surface, but in exercising this right it must
encroach no further upon the rights reserved by the
lessors than its necessities require. Its rights are con-
fined to its necessities for the mining operation, rather
than its mere desires or convenience. By this we mean
to say that as long as there is building space reasonably
suitable for this purpose outside of the enclosed lands
and field, it must first occupy such space before demand-
ing the right to build on the farming lands.

Any other interpretation of this contract would nul-
lify entirely the express reservation in the lease of the
right to the use of so much of the surface as is not in-
consistent with or harmful to the mining operations. The
fact that the company may build houses at one point
upon the land cheaper than they may build at another
place, or that the houses located at one place may be
more convenient than if located at another, does not
authorize it, under the terms of the contract, to ignore
the rights and privileges reserved by the lessors.

After an examination of all the evidence we have
concluded that, even though the mining plant be ex-
tended to such an extent as to more than double the
present output, it will be unnecessary, in such extension,
to occupy any part of the farm lands.

After an extended search we have been unable to find
any case involving a mining lease embracing terms sub-
stantially similar to the ones here involved, and for that
reason have not referred to any authority; but there
will be found in 48 L. R. A. (N. S.), 883, a note to the
case of Stonegap Colliery Company v. Kelley, wherein
there is a general review of the authorities bearing on
the rights of the parties in mining leases to the use of
the surface. That note shows the general rule to be that
the mine operator who does not own the surface, has the
implied and incidental right to such use of the surface
as is reasonably necessary to the profitable and beneficial
working of the minerals.

The evidence is that the defendants' saw mill is located on the same creek from which the plaintiff gets a part of its water supply for use in its boilers and that the water of this creek, because of the operation of the saw mill, at times is polluted with saw dust, and when so polluted is unfit for use in the boilers, and thereby interferes with the mining operations. As above indicated, the defendants have no right to make any such use of the surface of any of this property as will interfere with the efficient conduct of the mining operations, and clearly such pollution of the water required by the company is an interference with the efficient operation of the plant and hampers the company in the conduct of its affairs. In the light of this evidence the defendants should be required to remove their saw mill from its present location and place it at some point on said land, if they desire to keep it there, where its operation will not thus hinder the conduct of the company's business.

In the amendatory contract it was provided that, "second party (company) may have free access to all of said remaining standing timber on said land for the use and benefit of said lease to be used on said leased premises and no other," and in the original lease it was provided that, "the lessees are granted and given the right to use for mining purposes or building purposes in any manner by them all the timber that will girth less than sixty inches." Under these provisions it seems fairly plain that it was not in the minds of the parties at the time either of the instruments were executed that the timber on the Combs' tract of land should be used and consumed by the lessees in mining operations on any other land, and the action of the lower court in enjoining such use of it was, therefore, proper.

The action of the lower court was likewise proper in declining to grant to the defendants an injunction against the plaintiff prohibiting it from building houses on the Combs' land to be occupied by its employes engaged in mining on other lands. The original lease provided, "the lessors further covenant and agree with the lessees that as a part of this lease and any renewal thereof the lessees are hereby given the right and privilege of using the *said premises herein described* and any opening, shafts, tipples, inclines, switches, or any other appliance as may be thereon for the purpose of mining and removing any other coal they may desire to remove on lands adjacent

to this land that lessees may hereafter acquire." This provision of the lease contemplates the use of the premises as well as any appliance that may be thereon in getting out coal on adjacent lands, and the building and occupying of miners' houses for such purpose.

The evidence shows that in getting the timber from a certain remote part of the land it will be necessary for the company to go through some of the enclosed and cleared lands, but that at present there is sufficient timber near the coal operation for its purposes, and resort to the more remote timber will not be necessary for some time; but whenever the company does need such remote timber it will be entitled to a reasonable and convenient right-of-way or road over the cleared and enclosed lands in order to haul the said timber.

We have concluded therefore that the defendants are at present entitled to the possession of all the enclosed farming lands, and the right to the use of same, and that it is not as yet necessary to be used in the mining operations; that the defendants should be required to remove their saw mill and lumber yard to some point on the premises, if there be such a place, where they will not interfere with or hinder the operation of the mining plant by pollution of the water needed for that purpose; that all the timber girthing sixty inches or more is the property of the defendants under the amendatory contract, but that they have no right to cut or use the same except for their own building and construction work; that the company may use the space now occupied by the saw mill and lumber yard for building purposes; that the defendants may occupy by themselves or their tenants any of the houses which were on the property at the time of the original lease; that the company may build upon the Combs' land at the places herein indicated houses to be occupied by their employes engaged in getting out coal on other lands; that the company has no right to use timber taken from the Combs' lands in its mining operations on other lands; that the defendant may operate their saw mill on the lands in question at some point thereon where it will not interfere or hinder the efficiency of the mining operation, but only for the purpose herein indicated.

Any timber already sawed into lumber from logs belonging to the defendants they may use in their own

building and construction work or may sell to the company, but may not dispose of the same in any other way.

Any lumber already sawed from timber belonging to the company will be turned over to the company and the sawing thereof paid for by the company under the terms of the contract herein referred to.

The injunction against the defendants is modified as herein indicated and according to the terms of an order this day transmitted to the clerk of the Perry Circuit Court; the motion to dissolve the injunction against the plaintiff is overruled.

The argument on these motions was heard by Chief Justice Miller, and Judges Carroll, Thomas and Clarke, and this opinion is concurred in by them.