400 P.2d 132

**COLUMBIA INVESTMENT COMPANY, Inc., Appellant,**

**v.**

**M. M. SUNDT CONSTRUCTION COMPANY, Defendant-Appellee,**

**and**

**State of Arizona, Intervenor-Appellee.**

**No. 2 CA–Civ 18.**

Court of Appeals of Arizona.

March 18, 1965.

Scruggs & Rucker, Tucson, by Edgar F. Rucker, Tucson, for appellant.

Robertson, Childers, Burke & Drachman, Tucson, by Frank E. Drachman, Jr., Tucson, for defendant-appellee.

Attorney General's Office, Phoenix, by Charles Royall, Asst. Atty. Gen., for intervenor-appellee.

MOLLOY, Judge.

This is an appeal from a declaratory judgment holding that a mineral lease issued by the State Land Department in pursuance of A.R.S. § 27–235 for the mining of sand and gravel does not include the right to construct upon the leased premises machinery for the processing of sand and gravel by washing, screening, crushing and sorting same. The trial court further determined that a lessee under a commercial lease issued by the State Land Department in pursuance of A.R.S. § 37–281 et seq., as to the same land as leased by the mineral lease had the exclusive right as opposed to the mineral lessee to construct machinery on said land for the processing of sand and gravel after excavation.

The judgment was entered in favor of the holder of the commercial lease, M. M. Sundt Construction Company, hereinafter refer-

red to as Sundt, and in favor of the State of Arizona, intervenor, against the holder of the mineral lease, Columbia Investment Company, Inc., hereinafter referred to as Columbia.

Both parties conceded that the State Land Department had, under applicable statutes, the right to lease the same land to different lessees, one under a mining lease and the other under a commercial lease. The law suit seeks to determine the demarcation line between mining uses and commercial uses under the statutory law pertaining thereto.

A.RS. § 27–235, under which statute the subject mining lease was issued, provides in part:

"B. The lease shall confer the right:

"1. To extract and ship minerals, mineral compounds and mineral aggregates from the claim located within planes drawn vertically downward through the exterior boundary lines thereof. * * *

"2. To use as much of the surface as required for purposes incident to mining.

\* \* \* \* \* \*

"C. Every mineral lease of state lands shall provide for:

\* \* \* \* \* \*

"3. The construction of necessary improvements and installation of necessary machinery and equipment with the right to remove it upon expiration, termination or abandonment of the lease, if all monies owing to the state under the terms of the lease have been paid."

The mineral lease in question was issued to Columbia by the State Land Department on April 16, 1958. The lease contained provisions substantially in accord with the statutory language quoted above.

Prior to the issuance of the mineral lease, Sundt had a grazing lease upon the subject land issued in pursuance of A.R.S. § 37–281 et seq. Upon observing the commencement of the construction of the machinery to be used by Columbia in the washing, crushing, screening and sorting of rock, gravel and sand to be extracted from the subject land by Columbia, Sundt applied to the State Land Department for a reclassification of its lease upon the subject land to a commercial lease. No notice was given to Columbia of this application, which was granted, and a commercial lease over the same property was issued to Sundt by the State Land Department on July 6, 1959. Thereupon Sundt made demand upon Columbia that it pay rent as a subtenant of the leased premises in order to operate the machinery in question. This Columbia refused to do, contending that it had a right to install and operate the machinery under its mining lease. This action followed.

It was established in the evidence that since 1955, and possibly before, Arizona State Land Department has taken the position and enforced the policy that mining lessees were not permitted to install and operate machinery similar to that under consideration unless they also had a lease of the surface rights under A.R.S. § 37–281 et seq.

The dimensions of the machinery installed by Columbia on the demised premises was not established by the evidence, but pictures thereof were introduced into evidence. These pictures demonstrate that the machinery was several times higher than various dump trucks used in connection with the operation, and that the general area of the surface occupied by the processing operations was approximately 250 feet in diameter, judging, again, by the size of the trucks in the pictures. The machinery had a hopper or "grizzly" into which the material was initially placed by trucks which were loaded from a pit in the vicinity of the processing machinery. After the material was placed in this hopper, it was moved through the machinery by conveyor belts and shoots and eventually, after washing, crushing, screening, and sorting processes, into various large piles on the ground. All evidence pointed to the fact that the actual removal of the sand and gravel from the pit was a minor part of the work being conducted on the leased premises by

Columbia, the major part being the crushing, washing and sorting thereof.

The evidence established that machinery similar to that used by Columbia was in use throughout the state where sand and gravel is produced for construction purposes and that this machinery is usually, but not invariably, located in the immediate vicinity of the pit from which the material is removed. The testimony was in conflict as to whether the material when first removed from the pit has any commercial value, there being both testimony that it had no value, and also testimony from the same witness, that it had commercial value as "select material" used in highway construction.

Detailed evidence as to the method of the operation of the processing machinery was not put before the trial court. Neither was there any evidence as to what is done during placer mining, though an analogy is sought to be drawn to this type of mining. Both parties appear to have relied upon the court taking judicial notice of what ordinarily takes place in various mining operations and in the commercial production of sand and gravel.

Columbia's contentions on appeal are that gravel and sand are "minerals" within the contemplation of A.R.S. § 27–235, subsec. B, that the removing of same from the ground and the crushing, screening and washing thereof is mining, or "incident to" mining, that the machinery installed by it was "necessary machinery and equipment" for the purposes for which this property was leased and that therefore its operations are authorized by the mining lease which it possesses. The position of Sundt, which was that adopted by the lower court, is that the "mining" of sand and gravel ceases when the sand and gravel has been removed from its resting place in the soil and placed in the hopper of the machinery which is to crush, wash, screen and classify it into various categories for use in construction.

In approaching the legal problem presented, the court believes it important to keep in mind that there are two leases being construed and two separate chapters of our statutory law under consideration. The pertinent sections of the code pertaining to mining leases has been quoted above. Sundt's lease to the surface of this land was issued in pursuance of A.R.S. § 37–281 et seq., Art. 4, Chapter 2, of Title 37. Reading this article as a whole, it is apparent that it contemplates the leasing of state land for the full appraised rental value, with the lessee having the right to use the land for the purposes expressed in the lease, subject only to the reservation of "all oils, gases, coal, ores, minerals, fertilizer and fossils of every kind, which may be in or upon the land leased." (From A.R.S. § 37–287.) There is no indication that the leasehold rights will be subject to "mining" activities, or similar language. In this case, the lease of Sundt specified that it was "for the purpose of a gravel processing plant."

■ We are not concerned with the validity of this lease of Sundt. There is no challenge to it in the pleadings filed; the answer of the defendant Columbia admits the existence of the lease. Under these circumstances, this court can see no reason to give a favored construction to either lease, or either chapter of our code, over the other, when drawing the legal demarcation line between the uses permitted by each.

Numerous authorities have been cited to the court in the briefs on appeal, but none are directly in point. Analogies are drawn by both parties to cases involving coal, zinc, lead, gold, silver and monazite mining, to cases involving quarrying of limestone and other rock, and of cases involving milling and smeltering of ore.

■ Columbia draws an analogy between its operations and that of placer mining. Placer mining is, of course, "mining" under our law. Woolsey v. Lassen, 91 Ariz. 229, 371 P.2d 587 (1962).

The analogy to placer mining breaks down when we consider the fundamental nature of what is being done in these operations. In placer mining, the material being removed from the earth is not in es-

sence the mineral that is being sought. What is removed from the ground and placed in the placer mining machinery is composed only in a very small proportion of the mineral that is being mined. The placer operation itself is the process of *extraction* of mineral from the earth and thus of the essence of mining.

In sand and gravel mining, the material that is removed from the ground is basically all sand and gravel. The machinery being used is in only a very minor sense used to seek out and extract from the soil that which is being mined. In a greater sense, the machinery is used to reshape and classify the material, so as to give it commercial value.

For the same reason, this court does not believe there is a close analogy between milling ore in the mining industry and the work performed by Columbia's machinery, despite the fact that Sundt's expert witness on the milling of ore purported to see a very close analogy between the two operations.

Columbia relies principally, insofar as case law is concerned, upon the case of Hazard v. Superior Court, 82 Ariz. 211, 310 P.2d 830 (1957). This is an opinion which denied certiorari as to a decision of the Superior Court of Pima County brought before that court under the provisions of A.R.S. § 11–807 as an appeal from a zoning board of adjustment's decision. The trial court had held that the processing of sand and gravel in much the same manner as is involved in Columbia's operation here was "mining" and thus exempt from the zoning law under consideration. There was no citation of authority given in support of this holding.

On certiorari in the Supreme Court, the jurisdiction of the lower court was upheld, the appellate court expressly withholding its opinion as to whether or not the decision of the trial court was correct in holding these operations to be "mining." The court said in part:

"Assuming, for the sake of argument, that the court incorrectly answered the basic question, that of itself would not deprive the court of jurisdiction as its power is not limited to making correct decisions.

"We hold, on this record, the respondent court did have jurisdiction within the broad meaning of this term to do what it did and that it nowise acted in excess of its jurisdiction. This being true it is both unnecessary and improper for us in this certiorari proceeding to determine whether the trial court correctly resolved the 'mining' question."

This court does not consider the Hazard case to be binding upon it and therefore is making its own determination of the basic question here presented.

Appellant Columbia also relies upon four cases from other jurisdictions, which have not been persuasive to this court.

The first such case is Stonegap Colliery Co. v. Kelly and Vickers, 115 Va. 390, 79 S.E. 341, 48 L.R.A.,N.S., 883 (1913). In this case the court was construing a lease between private parties to determine whether the lessee could build tenement houses on the demised premises for the use of its employees. The lease was "for the purpose of mining coal and manufacturing coke." There was no negative covenant in the lease that the leased premises would not be used for other purposes. The court held that in the absence of such language, there was no implied covenant that the premises could not be used for similar lawful purposes which were not injurious to the landlord's rights. The case is not in point. Moreover, the court in the Stonegap Colliery case approached the problems presented to it by emphasizing that the language of the lease would be construed against the lessor. For reasons previously indicated, this we cannot do here, as we have two contending leases, which, when construed in the light of the statutory language authorizing them, must not overlap in usage.

The second case relied upon is Blue Grass Co. Corp. v. Combs, 168 Ky. 437, 182 S.W. 207 (1916). The court considers this case

to be of no help, in that the lease in question was between private parties and appears to have specifically authorized the use which the lessor was seeking to prevent, the building of houses for the lessee's miners.

The third case relied upon is Giersa v. Creech, 181 S.W. 588 (Mo.App.1916). In this case the court was construing a private lease which provided for royalty on ores "extracted." The lease was for the "purpose of digging, mining, and carrying away lead and zinc ores * * * which may be found in, upon, or under said lands." In view of this language the court found that the lease contemplated that the lessee would be permitted to separate the ore which was contained in a dump upon the leased premises from the dirt and rock therein by a washing process. The operation is similar to the placer mining operation previously considered herein.

The last case relied upon is National Light & Thorium Company v. Alexander, 85 S.C. 306, 67 S.E. 310 (1910). This is a case involving the placer mining of monazite. Again, for the reasons stated, the court believes that it is distinguishable from the problem presented here.

Two cases relied upon by Sundt have been of assistance to the court. The first is Commonwealth v. W. J. Sparks Co., 222 Ky. 606, 1 S.W.2d 1050 (1928). This case holds that the crushing and sorting into various sizes of rock removed from a rock quarry is "manufacturing" rather than mining.

Another case having pertinency is that of Tulsa Machinery Co. v. Oklahoma State Tax Commission, 208 Okl. 138, 253 P.2d 1067 (1953). This case also holds that companies engaged in the reducing of limestone rock removed from the earth into small sizes for commercial use were engaged in "manufacturing" and that such manufacturing process commenced as soon as the rock was removed from the earth and placed in a crusher.

■ One further factor has influenced this court to uphold the decision of the trial court. The fact that the Arizona Land Department has since 1955 carried out a policy concerning the point at issue in this appeal, and that this policy has not been upset by the legislature, is some evidence of the legislative intent. Jenney Freight Line v. Arizona Express, Inc., 89 Ariz. 343, 362 P.2d 664 (1961).

■ For the reasons stated this court holds that the trial court was correct in holding that the washing, screening, crushing, and sorting of sand and gravel, after extraction from the earth was not permissible under the mineral lease possessed by the defendant.

Though its answer in no way raised the issue, after the evidence was concluded, the defendant sought to amend its pleadings to allege that under the evidence admitted at the trial, the plaintiff Sundt and the intervenor State of Arizona were estopped to assert that Columbia's mineral lease did not permit it to operate the subject machinery.

■ In evaluating this defense, it must be remembered that estoppel is an affirmative defense and that the person relying thereon must show by clear and satisfactory proof that all of the elements of estoppel are present. Knight v. Rice, 83 Ariz. 379, 321 P.2d 1037 (1958).

■ It should also be remembered that, generally, the state and its agencies are not subject to the doctrine of estoppel *in pais*. Kerby v. State ex rel. Frohmiller, 62 Ariz. 294, 157 P.2d 698 (1945). Further, ordinarily, an *ultra vires* act of a state official may not be made binding upon the state through the doctrine of estoppel. Murphy v. State, 65 Ariz. 338, 181 P.2d 336 (1947).

As to Sundt, the appellant contends that it deliberately stood by and watched Columbia install its machinery and then when the machinery was installed, at heavy ex-

pense to Columbia, Sundt stepped in and demanded its "tribute." If these were substantially the facts, this court would be inclined to hold that Sundt would be estopped to assert its lease against Columbia's operations. 31 C.J.S. Estoppel § 94.

However, an examination of the transcript, viewed in a light favorable to the trial court's judgment, establishes much less than Columbia contends. This issue of estoppel was not tried to the lower court.

■. This court finds no showing in the record that Sundt deliberately waited to assert its rights under its commercial lease. It was not established as to how long it took to install Columbia's machinery. Neither was there evidence as to the time interval between the application of Sundt for reclassification and the issuance of its commercial lease. There was no evidence of how much it cost Columbia to install the equipment in question, nor as to how much Sundt had paid for an assignment to it of its grazing lease upon the property, other than that it had paid "much money." There was no showing of how much it would cost to remove Columbia's machinery from the property. For these reasons this court holds that the defense of estoppel must fail.

As to the State of Arizona, Columbia's contention of estoppel is based upon the fact that the State Land Department also "stood by" and watched Columbia install this equipment and later accepted rentals under the mineral lease from Columbia. The facts in regard to the State Officials "watching and waiting" are as indefinite as in the case of Sundt. No clear case was made out. The acceptance of rent under the mineral lease adds nothing significant.

In Knight v. Rice, supra, our Supreme Court quoted from a previous decision (City of Glendale v. Coquat, 46 Ariz. 478, 52 P.2d 1178, 1180, 102 A.L.R. 837 [1935] ) as follows:

"The essential elements of estoppel are that plaintiff, with knowledge of the facts, must have asserted a particular right inconsistent with that asserted in the instant action, to the prejudice of another who has relied upon his first conduct."

For the reasons heretofore stated, the collecting of rent under the mineral lease is not inconsistent with requiring that rent be paid for the processing of the minerals under a commercial lease. Furthermore, Columbia did not rely upon the collecting of the rent under the mineral lease. As far as the court can determine, there were no substantial rents paid under the mineral lease until Columbia's machinery had already been installed. Further, the purpose of the subject statutes being to raise public revenue, this court would be disinclined, even if the elements of estoppel were present, to apply the doctrine against the intervenor State of Arizona because of unauthorized acts of its agents. Murphy v. State, supra.

■ This court does not wish it to be implied from its decision that approval is given to the failure to give notice to Columbia of the decision to reclassify the subject land. Without the matter having been briefed to the court, it would appear that Columbia was entitled to notice of such decision under A.R.S. § 37-290. Though Sundt, as the grazing lessee, had a preferred right to a lease upon the subject premises after reclassification, our Supreme Court has held that this right is not absolute and that the final test in granting a commercial lease between contending applicants is the determination of what is in the best interests of this state and its people. Williams v. Greene, 95 Ariz. 378, 390 P.2d 907 (1964). With the records of the Arizona Land Department indicating that Columbia held a mineral lease upon the premises which Sundt was petitioning to be reclassified, it would certainly appear that Columbia should have been given notice of

the reclassification decision so that it could have also applied for a commercial lease upon the subject property. This, however, is a matter completely outside of the pleadings filed in the lower court, or any proposed amendments thereto, and outside of any contentions on appeal. Accordingly, it is not before this court. Young v. Bishop, 88 Ariz. 140, 353 P.2d 1017 (1960).

For the reasons heretofore stated, the judgment of the trial court is affirmed.

KRUCKER, C. J., and HATHAWAY, J., concurring.