458 P.2d 537

SCHOOL DISTRICT NO. 69 OF MARI-COPA COUNTY, Ernest R. Perry and W. E. Smith, Appellants,

v.

Robert K. ALTHERR, Appellee.

No. I CA–CIV 601.

Court of Appeals of Arizona.

Sept. 8, 1969.

Rehearing Denied Oct. 22, 1969.

Review Denied Dec. 9, 1969.

Robert K. Corbin, The County Atty., James P. Cunningham, Sp. Deputy County Atty., for School Affairs, Phoenix, for appellants.

Leibsohn & Goldstein, by Philip T. Goldstein, Phoenix, for appellee.

HATHAWAY, Judge.

The appellee, plaintiff below, instituted an action to recover damages from the School District and the individuals constituting its Board of Trustees in 1961. The complaint stated alternative theories of recovery—promissory fraud and promissory estoppel. The trial court directed a verdict in favor of three trustee-defendants and the jury returned a verdict in favor of the plaintiff against the remaining defendants.

The facts of the case, viewed in the light most favorable to the plaintiff, are as follows. In 1959, due to rapid population growth, the School District was faced with a serious shortage of classrooms. The problem was further complicated by the fact that the district was limited by statute[1] as to the amount of indebtedness it could incur and existing indebtedness was too close to the statutory limit to allow any additional bonding to pay for the construction of a school building at the time. The School Board therefore delegated to School Superintendent Morgan the task of approaching contractors and landowners in the area with a view to developing some kind of interim plan for additional school facilities.

In September, 1959, Morgan contacted the plaintiff, a licensed contractor dba A–1 Construction Company, who was building homes in a subdivision within the School District. A five-acre parcel of the subdivision, described as Tract A, had been set aside by the plaintiff for future construction of commercial buildings. He told Morgan, however, that he would be willing to construct a school building at cost on Tract A, provided a long-term purchase agreement could be arranged. Morgan indicated that the District had $30,000 available to make an initial payment.

After learning of plaintiff's proposal, the Board met with him in November, 1959. It was decided that a ten-room school building would be constructed, the Board to provide the plans for the physical facilities and the plaintiff to design the exterior of the building to harmonize with the subdivision motif. A lease agreement whereby the District would pay to the plaintiff one-twelfth of his total costs of construction each year for a period of twelve years, with an option to purchase the building for the sum of $1 at the end of the period was to be prepared.

The following month, Morgan presented to the plaintiff unsigned copies of the proposed lease, drawn by the Deputy County Attorney for School Affairs, which the plaintiff took to a mortgage company to obtain financing. The lease was not executed at this time because of the uncer-

---

1. A.R.S. § 15–1301 provides:

"No school district shall issue bonds for the purposes specified in this article to an amount in the aggregate, including the existing indebtedness, exceeding four per cent of the value of the taxable property erty within the school district as ascertained by the last assessment of state and county taxes previous to issuing the bonds, and not exceeding six per cent under any other statutory authority."

tainty of the price and of financing. The president of the mortgage company, after looking over the proposed lease, indicated to both Morgan and the plaintiff that his company would be willing to lend $250,000 —an amount considerably in excess of the contemplated requirements for the proposed ten-room structure.

Because of the mortgage company's generous offer, the Board decided to enlarge the structure to twenty rooms. The Deputy County Attorney approved the legality of the proposed undertaking on a twelve-year lease-option basis.

During the summer of 1960, the plaintiff, without an executed lease, began construction. He and his subcontractors decided to finance the project themselves in order to eliminate interim financing costs. In October, however, when the building was about 70 per cent completed, their funds were exhausted and construction was halted. The plaintiff met with Morgan and informed him that a loan would be necessary and asked that the lease agreement be executed for presentation to the mortgage company. The County Attorney's office was again contacted concerning execution of the proposed lease. The former Deputy for School Affairs had been replaced and his successor informed the parties that, in his opinion, the contemplated agreement was illegal.

The plaintiff thereupon decided to abandon the project as a school and convert the building into apartments. The Board, however, met with him and defendant Perry proposed that, if the plaintiff would obtain financing and complete the building, the District would purchase it as planned with the exception that the lease arrangement would be on a year-to-year basis rather than a twelve-year lease as originally agreed. Perry also stated that the Board would recommend to the electorate of the District, as soon as the bonding margin was adequate, that the balance be paid by the sale of bonds rather than by continuing lease agreements. The plaintiff was told that the margin would probably be

adequate the next year, 1961, but in no event later than 1962.

No written agreement was executed but the plaintiff borrowed money from one Floyd Baldwin, giving certain assets as security for the loan. At the end of 1960, the building was completed and the District took possession.

The District occupied the building during the remainder of the 1960–1961 school year under an oral agreement with the plaintiff. On June 6, 1961, the members of the Board signed the following which in substance reiterated the Board's proposal in November, 1960:

"June 6, 1961

TO WHOM THIS MAY CONCERN:

It is the intent of the Board of Trustees to continue to rent or lease the Paradise Valley Elementary School No. 2 which is located at 9827 North 32nd Street Phoenix 20, Maricopa County, Arizona so long as a fair rate of rental can be agreed upon by the owner of the buildings and the Board of Trustees.

It is also the desire of the Board of Trustees to propose to the voters of the Paradise Valley Elementary School District No. 69 a bond election to purchase the above referred to school building when the bonding margin of the district is sufficient to yield enough to cover the purchase of the building at a fair price."

A written lease was executed which provided for $12,000 to be paid as rent for the school year 1961–1962.

Following the 1961–1962 term, it appeared that the bonding margin would soon be adequate to provide funds so Morgan urged the Board to submit the matter to the electorate. The Board, however, declined to take such action. On November 26, 1962, a PTA meeting was held during which a "Citizens Committee," previously appointed by the Board, presented its report which included a recommendation not to purchase plaintiff's school building but to obtain other facilities. Although defend-

ant Perry denied having made such statement, there was testimony that he stated at this meeting, when questioned about the June, 1961, letter:

"We gave that just so Altherr could get his financing. We never intended to purchase at that time."

·Relations between the plaintiff and the Board became strained. The plaintiff presented his construction cost sheets to the Deputy County Attorney for School Affairs, but no action was taken by the Board. Although no written lease for 1962–1963 had been executed, the School District continued to use the school building. After an unsuccessful demand for possession, the plaintiff instituted a forcible entry and detainer action and a writ of restitution was issued during November, 1962. Because of the hardship that would have resulted to the students of the District, however, the plaintiff did not enforce the writ and entered into a written agreement, dated May 14, 1963, signed by three Board members including defendants Perry and Smith for the School District.

In this agreement, the District, as "buyer," agreed to (1) on or before May 14 call a meeting of the Board and adopt a resolution to purchase the building, Tract A, and all equipment, furniture, fixtures and appliances for the sum of $250,000, (2) authorize the sale of bonds therefor and (3) petition the Board of Supervisors of Maricopa County to order a special election by the electorate of School District No. 69 to approve the purchase and sale of bonds. The sale, if approved, was to take place not later than September 1, 1963.

In addition, the agreement called for payment by the School District of the sum of $24,000 as rent for the period July 1, 1962 through June 30, 1963. If the Board of Supervisors failed to order a special election, plaintiff reserved the right to enforce the writ of restitution. Also, if the sale was disapproved at the election, the School District was to vacate the premises within five days following the election.

The agreement recited:

"Buyer warrants and represents that it will conduct the aforesaid election, if held, in a fair and impartial manner, without conducting any campaign adverse to the proposal herein contained; provided Buyer may advise the public of the contents of any appraisal obtained by it to said Tract 'A' and improvements."

An option was also granted to the School District for the purchase of six lots adjoining Tract A for $25,000 in the event that the purchase was approved at the election.

The proposal was submitted to the electorate but was defeated; primarily, according to the plaintiff, because the Board members violated their covenant not to conduct "any campaign adverse to the proposal," in that at least some of the Board members openly campaigned against the proposal.

Following the election, the School District having failed to pay the agreed rental, the plaintiff sued for same and prevailed, recovering the sum of $24,000. He then instituted this lawsuit and the case was tried to a jury which returned a verdict in the plaintiff's favor for $300,041.15. The judgment entered thereon was reduced to $300,000 to conform to the plaintiff's demand. See, Smith v. Tang, 100 Ariz. 196, 412 P.2d 697 (1966).

■ Although numerous questions are presented for review, we need consider but one, i.e., whether the trial court erred in submitting the case to the jury. If the evidence is insufficient to support a verdict for the plaintiff or so weak that the trial court would feel constrained to set it aside on a defense motion for a new trial, a verdict directed in favor of the defendants is justified. Higgins v. Kittleson, 1 Ariz. App. 244, 401 P.2d 412 (1965).

■ Although in this jurisdiction promissory fraud is recognized, Berry v. Robotka, 9 Ariz.App. 461, 453 P.2d 972 (1969); Jamison v. Southern States Life Insurance Company, 3 Ariz.App. 131, 412 P.2d 306 (1966); Caldwell v. Tilford, 90 Ariz. 202, 367 P.2d 239 (1961), a concurrence of the nine essential elements are

**338**

requisite to an action for fraud. Nielson v. Flashberg, 101 Ariz. 335, 419 P.2d 514 (1966). A failure of proof as to any single element is fatal. Cullison v. Pride O'Texas Citrus Association, 88 Ariz. 257, 355 P.2d 898 (1960); Lehman v. Whitehead, 1 Ariz.App. 355, 403 P.2d 8 (1965). We believe such was the case here and that a verdict should have been directed in favor of the defendants because of absence of the plaintiff's "right to rely."

Often the facts affecting the right to rely are in dispute, and then there is a question for the trier of fact. 37 C.J.S. Fraud § 129. However, when the facts are undisputed, the question is one for the court. Horne v. Timbanard, 6 Ariz.App. 518, 434 P.2d 520 (1967). We are of the opinion that the trial court erred in submitting the fraud issue to the jury for the reason that the plaintiff's reliance on the trustees' statements, as a matter of law, was not justified.

The governing body of a school district is its board of trustees. A.R.S. § 15–431. At the times herein involved, A.R.S. § 15–445 provided:

"A. The board of trustees shall:

\* \* \* \* \* \*

"4. Construct school buildings *when directed to do so by a vote of the district.*

\* \* \* \* \* \*

"6. Purchase or sell school sites *when authorized by a vote of the district,* but such authorization shall ·not necessarily specify the site to be purchased."

(Emphasis supplied)

School boards have only the authority granted by statute which must be exercised in the mode and within the limits permitted by the statute. Elder v. Anderson, 205 Cal.App.2d 326, 23 Cal.Rptr. 48 (1962); State ex rel. Thurston v. School City of Anderson, 236 Ind. 649, 142 N.E.2d 914 (1957); Goldman v. Zimmer, 64 Ill.App.2d 277, 212 N.E.2d 132 (1965). Thus, a prerequisite to the exercise of the Board's power with regard to school buildings and sites is the antecedent approval of the electorate. See Garrett v. Tubac-Amado

School District No. 5 of Santa Cruz County, 9 Ariz.App. 331, 451 P.2d 909 (1969).

School trustees are public officers. 78 C.J.S. Schools and School Districts § 106(a); 47 Am.Jur. Schools § 29; State ex inf. McKittrick v. Whittle, 333 Mo. 705, 63 S.W.2d 100, 88 A.L.R. 1099 (Mo.1933), and as such must act for the public interest. Dick v. Cahoon, 84 Ariz. 199, 325 P.2d 835 (1958). A public office is considered a public agency or trust, created in the interest and for the benefit of the people, i.e., public officers are servants of the people. 42 Am.Jur. Public Officers § 8; 67 C.J.S. Officers § 6. A public officer may not agree to restrict his freedom of action in the exercise of his powers, 43 Am.Jur. Public Officers § 295, and an agreement which interferes with his unbiased discharge of his . duty to the public, in the exercise of his office, is against public policy and unenforceable. Id. § 294. As stated in Brown v. Gardner, 232 Ark. 197, 334 S.W.2d 889 (1960):

"The powers of school directors are conferred by law for public purposes, and the exercise thereof, involving as it does a matter of future policy properly subject to change to meet changing conditions, cannot be restricted by an agreement of the nature of the one here involved." 334 S.W.2d at 891.

Furthermore, the trustees' statements would constitute not only a restriction on their own freedom of action but an attempt to bind successor Boards. A.R.S. § 15–471 provides for election of trustees:

"A. An election shall be held in each school district on the first Tuesday in October each year."

"B. \* \* \* In districts having five trustees, one shall be elected each year and shall hold office for a term of five years from January 1 following his election \* \* \*."

Where, as under our statutory scheme, a school board consists of several members whose terms expire at different times with annual elections being held to fill offices whose terms have expired, the

school board is considered a noncontinuous body, organized each year. 78 C.J.S. Schools and School Districts § 106. In other words, the defendant School District had a "new" school board each year.

The plaintiff in his dealings with the School Board was charged with notice of the limitation of its authority. Twitchell v. Bowman, Wyo., 440 P.2d 513 (1968); Schull Construction Company v. Board of Regents of Education, 79 S.D. 487, 113 N.W.2d 663, 3 A.L.R.3d 857 (1962); 67 C.J.S. Officers § 107(a); Brown v. Gardner, supra. We believe, as a matter of law, that the plaintiff was charged with notice that the trustees' powers were conferred by law for public purposes, and the exercise thereof, involving a matter of future policy subject to change to meet changing conditions, could not be restricted by the attempted agreement here. State ex rel. Phillips v. Trent Independent School District, Tex., 141 S.W.2d 438 (1940). To hold otherwise and expose school trustees to potential liability for changing their minds in the public interest would be like stripping a judge of his cloak of judicial immunity when he exercises his discretion, be it right or wrong. Public policy dictates that a school trustee's fiduciary duty to the public be performed unfettered by threats of litigation.

If under all the circumstances it would be unreasonable to rely upon the representations made, a representee is bound by his action. McCarthy v. Cahill, 249 F.Supp. 194 (D.C.1966). One cannot close his eyes to a situation and then be heard to say that he had a right to rely. Williams v. Joslin, 65 Wash.2d 696, 399 P.2d 308 (1965). The plaintiff, charged with knowledge of the legal effect of an unenforceable agreement, as a matter of law, had no right to rely thereon. Adamson v. Maddox, 111 Ga.App. 533, 142 S.E. 2d 313 (1965).

The plaintiff's second claim for relief denominated "contract," alleged in substance: The trustees' promise, the plaintiff's substantial justifiable reliance on the promise, that the trustees should reasonably have expected the promise to induce action on the part of the plaintiff, that the plaintiff's action in completing the construction of the school building was induced by such promise, and that the plaintiff had sustained damage as the result of such promise. The doctrine of promissory estoppel, as set forth in the Restatement of the Law of Contracts § 90, has been adopted in this jurisdiction. Waugh v. Lennard, 69 Ariz. 214, 211 P.2d 806 (1949); Weiner v. Romley, 94 Ariz. 40, 381 P.2d 581 (1963):

> "A promise which the promisor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promisee and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise."

The doctrine of promissory estoppel traditionally has been applied as a substitute for consideration. See, Glitsos v. Kadish, 4 Ariz.App. 134, 418 P.2d 129 (1966); 1 Williston on Contracts § 140 (3d ed.); 78 Yale L.J. 342, Promissory Estoppel and Traditional Contract Doctrine (1969); 98 U.Pa.L.Rev. 459, Promissory Estoppel: Requirements and Limitations of the Doctrine (1969). The trial court here, in its instructions to the jury, indicated that the theory of promissory estoppel was "an outgrowth of the tort of fraud." Plaintiff, on appeal, denominates his second claim for relief as a "tort based on the principle of reliance." He states in his brief:

> "It has never been plaintiff's contention that the misrepresentation made to him in November of 1960 was promissory in a contractual sense, but rather constituted a tortious misrepresentation upon which plaintiff relied to his detriment."

Although it has been recognized that an action for fraud or deceit is "the most comparable" to a Section 90 action, Hoffman v. Red Owl Stores, Inc., 26 Wis.2d

**340**

683, 133 N.W.2d 267 (1965), we find no cases that refer to the "tort of reliance" as hypothesized by the plaintiff.

 Our Supreme Court has indicated that the doctrine of promissory estoppel may be applied in certain situations as a general principle of estoppel. Weiner v. Romley, supra. The court, in *Weiner,* merely recognized the applicability of the estoppel principle to promises. One recent law review article points out that equitable estoppel is a shield, not a sword, hence it forms no basis for a cause of action for damages in contrast to promissory estoppel which gives rise to a cause of action for damages. 22 Okl.L.Rev. 89, Estoppel: Status of Promissory Estoppel in Oklahoma (1969); see also, 81 L.Q.Rev. 223, Estoppel as a Sword (1965); Hoffman v. Red Owl Stores, Inc., supra; Goodman v. Dicker, 83 U.S.App.D.C. 353, 169 F.2d 684 (1948); Wheeler v. White, 398 S.W. 2d 93 (Tex.1966).

 Section 90, supra, however, is being used as a basis for enforcement of *promises* and we find recovery being denied for lack of a "real" or "actual" promise. See, 1A Corbin on Contracts §§ 200 and 201; Dulien Steel Products, Inc. of Washington v. Bankers Trust Company, 298 F.2d 836 (2d Cir. 1962); Barker-Lubin Co. v. Wanous, 26 Ill.App.2d 151, 167 N.E. 2d 797 (1960); Cederstrand v. Lutheran Brotherhood, 263 Minn. 520, 117 N.W.2d 213 (1962); Hilton v. Alexander & Baldwin, Inc., 66 Wash.2d 30, 400 P.2d 772 (1965); Ahnapee & Weston Railway Company v. Challoner, 34 Wis.2d 134, 148 N.W. 2d 646 (1967). The idea behind this requirement is that promissory estoppel protects *reasonable reliance,* and that reliance is reasonable only if it is induced by an actual promise. Section 90 comes into play "if injustice can be avoided only by enforcement of the promise." Here we find no *promise* to buy the plaintiff's school building. The trustees merely expressed their "intent" and "desire." An expression of an intention to do something is not a promise, Marlin v. Drury, 124

Mont. 576, 228 P.2d 803 (1951), and the word "desire" is an expression of present purpose rather than a promise of future action. Sessions v. Skelton, 163 Ohio St. 409, 127 N.E.2d 378 (1955); Detweiler v. Capone, 357 Pa. 495, 55 A.2d 380 (1947). We hold, therefore, that the doctrine of promissory estoppel was inapplicable to the facts of this case and should not have been submitted to the jury. Furthermore, assuming arguendo a promise had been proven, i. e., a promise to purchase the building, enforcement of the promise could be sought only against the School District, which cannot be bound by estoppel. Columbia Investment Company v. M. M. Sundt Construction Company, 1 Ariz.App. 124, 400 P.2d 132 (1965).

For the reasons herein stated, the judgment is reversed with instructions to enter judgment for the defendants.

MOLLOY and KRUCKER, JJ., concur.
NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120, subsec. E.